[Cite as *In re Ja.B.*, 2024-Ohio-453.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE JA.B., ET AL. | : | |
| | | Nos. 113056 and 113087 |
| A Minor Child | : | |
| | | |
| [Appeal by Mother and Father] | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 8, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22902122 and AD22902123

---

### *Appearances:*

Gregory T. Stralka, *for appellant* Mother.

Wargo Law, LLC, and Leslie E. Wargo, *for appellant* Father.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Appellant J.B. ("Mother") and appellant R.B., Jr. ("alleged Father") appeal from the trial court's July 2023 judgments granting permanent custody of their twin children, Ja.B. and Jo.B., to appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "agency"). After a thorough review of the facts and pertinent law, we affirm.

**Procedural History**

{¶ 2} The twins were born in February 2022. On March 3, 2022, upon the twins' discharge from the hospital, CCDCFS filed a complaint in which it alleged that the children were dependent and sought temporary custody of them. An adjudicatory hearing was held. Mother and alleged Father were present, stipulated to an amended complaint, and the twins were adjudicated dependent and placed in the agency's temporary custody.

{¶ 3} On January 30, 2023, the agency filed a motion to modify temporary custody to permanent custody. Trial was originally scheduled for May 1, 2023, but upon appellants' motion for a continuance for additional time to work on their case plans, the trial date was continued. On June 28, 2023, alleged Father filed a motion for legal custody to be awarded to one of two paternal aunts, R.J. or T.R. The trial took place on July 10, 2023, and thereafter the trial court issued its judgments granting CCDCFS's motion for permanent custody and denying alleged Father's motion for legal custody to one of two paternal aunts.

**Factual History**

{¶ 4} At all relevant times, Mother and alleged Father were together as a couple. Three CCDCFS case workers handled this case and testified at trial. The first case worker testified that her contact with Mother and alleged Father began in 2021, regarding another one of Mother's children who is not at issue in this case. This first case worker was involved with the case until November 2022, when she left the agency.

{¶ 5} The agency's involvement with Mother and alleged Father was continuous from 2021 through the time the twins were born in February 2022, and through the conclusion of the trial court proceedings in this case.

{¶ 6} The agency was granted permanent custody of Mother's older child in October 2022, due to allegations of physical abuse against the child; alleged Father (who is not the child's biological father) was the suspected perpetrator of the abuse.

{¶ 7} The record demonstrates that case plans for Mother and alleged Father were developed in 2021, when they first were involved with CCDCFS relative to the older child. Mother and alleged Father's case plan included addressing issues relative to housing, mental health, and domestic violence. The agency made numerous referrals for the appellants at that time in an attempt to address the objectives of their case plans. The appellants' issues remained unresolved at the time of the twins' birth, however. For example, when the twins were released from the hospital in March 2022, Mother and alleged Father were homeless and thus, they were committed to the agency's temporary custody at that time. The initial case

plan objectives for appellants continued, with the addition of a substance abuse assessment and establishment of paternity for alleged Father. The twins were swabbed for their DNA in October 2022; alleged Father never complied with the agency's request that he also be swabbed, and thus his paternity was never established.

{¶ 8} Upon the twins' initial placement with CCDCFS, the agency pursued relative placement. Paternal grandfather expressed interest and was considered but was ruled out because he had "an extensive history with the Agency" and his housing would not have accommodated the twins. (Tr. 33).[1] Paternal grandmother was also considered but ruled out because of her "extensive history with the Agency." *Id.*

{¶ 9} CCDCFS also considered paternal aunt R.J. However, she also "had a history with a Children Services agency that resulted in two * * * children that were in her care [being] removed two times, and subsequently put in the legal custody of somebody else. She also had her infant child die while in her care" from an "undetermined" cause. *Id.* at 33, 46.

{¶ 10} CCDCFS further attempted to investigate a cousin, but the cousin did not return any of the agency's calls. Maternal grandmother was contacted, but she told the agency she did not want to be considered.

{¶ 11} Consequently, upon the twins' removal from appellants in March 2022, they were placed with a foster family, where they remained during the

---

[1] All transcript references are to the July 10, 2023 trial transcript.

pendency of this case. One of the agency's case workers who observed the twins in their placement with the foster family testified that she did not have any concerns for the twins' safety with the foster parents and that the home was appropriate. The case worker elaborated that the "children are very bonded to their foster parents. They're happy. They're well taken care of. Their foster parents * * * do very well with the kids. They * * * are good with knowledge of what the kids need and getting them to services to make sure they're doing all right." *Id.* at 36.

{¶ 12} When the children were first placed in agency custody in March 2022 through July 2022, appellants' visitation with them was limited to "virtual phone visits" because appellants had lice. *Id.* at 40. The case worker described those visits as "inconsistent." *Id.* When appellants were able to participate in in-person visits with the twins they were consistent up until October 2022. The case worker testified that appellants interacted with the twins, but they "relied heavily on the parenting coach" for tasks such as getting diapers and wipes and preparing formula for feedings. *Id.* at 41. The second case worker, who started on the case in November 2022 when the first case worker left and continued until mid-May 2023, testified that appellants sometimes needed to be reminded about changing the twins' diapers.

{¶ 13} The second case worker further testified that Mother started mental health treatment with one of the providers the agency referred her to but then stopped participating. Mother acknowledged to the case worker that she had

stopped participating and told the case worker she was going to reengage but never did.[2]

{¶ 14} Regarding housing, appellants obtained a housing voucher for payment of rent for one year, starting in May 2022. At the time of the July 2023 trial, the housing voucher had expired, and appellants had moved out of the house they had been living in. Alleged Father told the case worker that he and Mother had secured another house and provided the third case worker with an address. The third case worker contacted appellants to schedule a home visit; appellants never responded. Mother later told the case worker that the address was a "scam" and she alleged Father were living with a relative. *Id.* at 132.

{¶ 15} Appellants did not participate in any parenting programs. Concerning domestic violence, a case worker testified that "a ton of referrals" were made for both appellants. *Id.* at 63. The case worker testified that she specifically tried to get Mother to engage with one particular entity for parenting services because it offered a lot of virtual classes (transportation was an ongoing issue for appellants). Mother would say she was going to engage, but never did. When the case worker questioned Mother about her lack of engagement, Mother admitted to the worker, "I know it doesn't look good." *Id.* The worker testified that she gave, and repeatedly offered, appellants bus tickets.

---

[2] The case worker testified that Mother had to go back to the mental health provider in order to obtain documentation of her prior attendance so that she could be considered for a housing voucher. Mother never continued treatment as requested by CCDCFS, however.

{¶ 16} Concerning the substance abuse component of alleged Father's case plan, Father told the case worker that he smoked marijuana. Alleged Father did get an assessment, which revealed that he needed intensive outpatient program ("IOP") therapy, and he was offered IOP virtual classes. Alleged Father never followed through with the subsequent classes, however. The program provided a "curb-to-curb" driving service for participants to use when participants needed to come in person for their drug screens. *Id.* at 69. Alleged Father was "very resistant to that" because, according to him, it was too time-consuming. *Id.* Alleged Father was released from the program due to his lack of participation.

{¶ 17} Alleged Father was not able to demonstrate success with the mental health component of his case plan. He told one of the case workers that he had completed an assessment, but never produced the paperwork confirming that despite being asked for it.

{¶ 18} The second case worker also had the opportunity to observe the twins in their foster placement. She testified that the foster parents "exceeded" meeting the children's basic needs and that the twins had a "natural bond" with the foster parents. *Id.* at 76.

{¶ 19} The second case worker also testified that in the spring of 2023, the previously mentioned paternal aunt, R.J., and another paternal aunt, T.R., contacted her because they wanted to meet the twins in person; they had only seen the children virtually. Maternal grandmother also expressed an interest in visiting

the babies in person. In-person visitations with the aunts and maternal grandmother never occurred, however.[3]

{¶ 20} T.R. expressed a possible interest in legal custody of the twins. When the case worker inquired more about T.R. being a possible placement she learned that T.R. resided with R.J. (who had already been ruled out as a possible caregiver) and by T.R.'s own admission to the case worker, she was not financially stable enough to get housing on her own.

{¶ 21} The third case worker, who took over the case in mid-May 2023, testified that as of the time of the July 2023 trial, appellants had not made substantial progress on the parenting, domestic violence, substance abuse (alleged Father), and housing components of their case plans.[4]

{¶ 22} Alleged Father presented testimony from his two sisters — R.J. and T.R. — whom he sought to have legal custody of the twins. R.J. testified that her then seven-year-old daughter had previously been removed from her care but was returned to her after she completed her case plan objectives. R.J. testified that her sister T.R. lived with her temporarily. R.J. admitted that she had never seen the twins in person; she had only seen them virtually. The sister testified that her

---

[3] The record shows that an in-person visit was set up for the Memorial Day weekend, but it did not occur because of the logistics involved in making it happen over a holiday weekend.

[4] The third case worker testified that appellants told her on the day of the hearing that they both had secured jobs at Speedway. They did not provide documentation of their claim, and the case worker was not able to independently verify it.

brother's (alleged Father) attorney contacted her two or three weeks prior to the trial, inquiring about her interest in obtaining legal custody of the twins.

{¶ 23} T.R. testified that she had been living with R.J. for approximately five months. Prior to that, T.R. lived with her husband in Pennsylvania for approximately one month. She and her husband were in the process of getting divorced. Other than the time (as of trial) she lived with her sister and the month she lived in Pennsylvania, T.R. testified "I have been living with my mother basically all my life." Tr. 163. According to T.R., she was hoping to get her own place within the next three months.

{¶ 24} T.R. also testified that she had no in-person contact with the twins. She was not aware of the reasons why CCDCFS had custody of the children in the first place. According to T.R., she was "brought into [the matter] per [her] brother [alleged Father] when he asked if [she] * * * would take custody over" the twins. *Id.* at 166.

{¶ 25} The twins' guardian ad litem ("GAL") filed a report and recommendation with the court. The GAL stated his recommendation on the record at trial. The GAL believed it to be in the best interest of the twins to grant CCDCFS's motion for permanent custody and to deny alleged Father's motion for legal custody to either paternal aunt. The GAL explained that while he believed the paternal aunts were "wonderful people," they had no relationship with the twins. *Id.* at 177. He contrasted that to the twins' relationship with the foster parents, which he

described as consistent since their birth and consisting of a "very strong" bond. *Id.* at 178.

## Trial Court's Findings

{¶ 26} In granting CCDCFS's motion for permanent custody, the trial court first found under R.C. 2151.414(B)(1) that the twins cannot be placed with either of their parents within a reasonable time or should not be placed with either of their parents. The court further found that reasonable efforts were made to prevent the children's removal and for reunification. The trial court also considered the best interest factors under R.C. 2151.414(D)(1) and found that permanent custody to CCDCFS would be in the twins' best interest.

{¶ 27} Further, the trial court found that appellants failed to make significant progress on their case plans and therefore that an extension of temporary custody could not be had and was not in the children's best interest.

{¶ 28} The trial court also found that legal custody to either of the paternal aunts was not in the twins' best interest and denied alleged Father's motion.

## Mother's Assignments of Error

I.    The Department of Children and Family Services failed to establish that permanent custody should be granted under the provisions of Ohio Revised Code 2151.414(E).

II.   The trial court's decision granting permanent custody of the children was contrary to the best interests of the children.

## Alleged Father's Assignments of Error

I.    The trial court's judgments granting the agency's motions for permanent custody and denying the father's motion for extension

are against the manifest weight of the evidence, an abuse of discretion, and are not in the children's best interest.

II. The trial court erred by denying the Father's motion for legal custody or, at a minimum, the trial court erred by denying an extension of time.

**Law and Analysis**

{¶ 29} Mother's two assignments of error and alleged Father's first assignment of error challenge the trial court's decision to grant CCDCFS's motion for permanent custody and will be considered together.

{¶ 30} We begin our analysis with the recognition that, while a parent's right to raise a child is an essential and basic civil right, *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), children have the right to "parenting from either [biological] or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 31} R.C. 2151.414, Ohio's permanent-custody statute, provides that the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence has been defined as

III. "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a 'reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 32} We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

{¶ 33} Recently, the Supreme Court of Ohio held that,

> "[g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, * * * the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 11.

{¶ 34} Appellants' arguments in this appeal are manifest-weight-of-the-evidence arguments. Regarding a challenge based upon manifest weight of the evidence, the Supreme Court of Ohio has explained:

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their [judgment], if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶ 35} When conducting a manifest-weight review, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and

determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

{¶ 36} Therefore,

> VI. [t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *Id.*, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

*In re C.T.*, 8th Dist. Cuyahoga No. 87159, 2006-Ohio-1944, ¶ 15.

{¶ 37} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and, furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 38} Under the first prong of the permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" (R.C. 2151.414(B)(1)(a)).

{¶ 39} Here, the trial court found under R.C. 2151.414(B)(1)(a) that the twins "cannot be placed with either of [their] parents within a reasonable time or should not be placed with [their] parents." In making this finding, the trial court relied on the factors set forth in R.C. 2151.414(E), the finding of any one of which requires the "cannot or should not be placed" finding. Specifically, R.C. 2151.414(E) states, in pertinent part, that "[i]f the court determines, by clear and convincing evidence, * * * that one or more of the [enumerated (E) factors] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"

{¶ 40} Under R.C. 2151.414(E)(1), the trial court found that both Mother and alleged Father failed to remedy the conditions that led to the twins' removal. The record demonstrates that in 2021, before the twins were born, CCDCFS established case plans for Mother and alleged Father. The case plans required them to work on issues relative to housing, mental health, and domestic violence. The original plans were continuous up to, and extended after, the twins' birth; substance abuse and the establishment of paternity were added for alleged Father after the twins were born.

{¶ 41} The record supports the trial court's "failure to remedy" finding. Mother stopped engaging in mental health services and, despite telling the case worker that she was going to resume, never did. Similarly, despite alleged Father telling the agency he completed a mental health assessment, he never produced documentation confirming that he did. Further, besides the initial assessment, alleged Father failed to participate in services for substance abuse. His failure to participate was noteworthy given that the program he was referred to was mostly virtual and for the times in-person attendance was required (for drug screenings) the provider offered curb-to-curb pick-up and drop-off service. Neither Mother nor alleged Father participated in parenting programs the agency referred them to and, by Mother's own admission, it did not reflect positively on them.

{¶ 42} Although appellants were successful in obtaining housing at one point during the proceedings, they were no longer in that housing at the time of trial and were seemingly living with a relative. The record demonstrates that appellants were duplicitous with CCDCFS about their housing situation after they were

required to move out of the house they had obtained and the agency was unable to visit the place where they were living as of the trial date.

{¶ 43} On this record, the weight of the evidence clearly and convincingly supports the trial court's "failure to remedy" finding.

{¶ 44} The trial court also found under R.C. 2151.414(E)(4) that appellants "demonstrated a lack of commitment" toward the twins. As ground for this finding, the court specifically referenced appellants "unwillingness to provide an adequate permanent home" for the twins. Upon review, the same reasons that support the trial court's "failure to remedy" finding support its "lack of commitment" finding. The weight of the evidence clearly and convincingly supports the trial court's "lack of commitment" finding.

{¶ 45} R.C. 2151.414(E)(11) allows the trial court to make a finding that a parent has had his or her parental rights of a sibling involuntarily terminated and the parent has failed to provide clear and convincing evidence that, despite the termination, he or she can provide a legally secure permanent placement for the children at issue in the present proceeding. The trial court made this finding for Mother.

{¶ 46} The record demonstrates that CCDCFS's involvement with Mother and alleged Father predated the twins' birth and involved Mother's older child, who was removed from her due to alleged abuse; alleged Father was purportedly the

perpetrator of the abuse.[5] Mother ultimately had her parental rights as to the older child terminated in October 2022. A review of the record reveals that Mother failed to show that, despite having her parental rights to her older child involuntarily terminated, she can provide a legally secure permanent placement for the twins. Simply, as of the trial date, Mother had not made substantial progress on her case plan objectives. The trial court's finding under R.C. 2151.414(E)(11) as to Mother was clearly and convincingly supported by the weight of the evidence.

{¶ 47} The trial court further made a finding under R.C. 2151.414(E)(14) that appellants had an unwillingness to provide for the twins. For the reasons already discussed, the trial court's finding was clearly and convincingly supported by the weight of the evidence.

{¶ 48} R.C. 2151.414(E)(16) allows a trial court to make a "catchall" finding by considering any other factor the court finds relevant. Here, the trial court found that Mother had lost custody of her older child due to allegations of abuse, alleged Father was the purported perpetrator of the abuse, and Mother was still in a relationship with and living with alleged Father. The trial court's finding was clearly and convincingly supported by the record.

{¶ 49} Mother and alleged Father were together in 2021 when CCDCFS first became involved with them. At that time, which predated the twins' birth, the agency was concerned about abuse of Mother's older child. A case plan was

---

[5] We reiterate that alleged Father is not the biological father of Mother's older child.

developed at that time for both Mother and alleged Father. At the time of the twins' birth, Mother and alleged Father were still together and the agency was still involved with them. They had not made significant progress on their case plans, which continued to be the situation throughout the pendency of the case. Mother ultimately lost custody of her older child and alleged Father was thought to be the child's abuser. This situation certainly was a relevant factor in the trial court's decision on the issue of permanent custody of the twins.

{¶ 50} In light of the trial court's determination, which we have found clearly and convincingly was supported by the weight of the evidence, that five of the factors under R.C. 2151.414(E) applied, the trial court was required to find, as it did, that the twins cannot be placed with Mother or alleged Father within a reasonable time or should not be placed with Mother or alleged Father. *See* R.C. 2151.414(E) ("If the court determines, by clear and convincing evidence, * * * that one or more of the [enumerated (E) factors] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"); *see also In re I.R.*, 2021-Ohio-3103, 179 N.E.3d 138, ¶ 69 (8th Dist.) (based on its findings under R.C. 2151.414(E), the juvenile court was required to find that the child could not be placed with either of his parents within a reasonable time or should not be placed with either parent), citing *In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58.

{¶ 51} We now consider the second prong of a motion for permanent custody, that is, the best interest of the child. In determining the best interest of the

child, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

VII. (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

VIII. (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

IX. (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

X. (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

XI. (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 52} The Supreme Court of Ohio has stated the following in regard to a best interest determination:

XII. A court must conclude by clear and convincing evidence that an assignment of permanent custody is in the best interest of the child. R.C. 2151.414(E). The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. The heightened importance that the appellate court assigned to R.C. 2151.414(D)(4) is not required by or even hinted at in the statute, nor is the trial court required to credit evidence in support of maintaining the parental relationship when evidence supporting termination outweighs it clearly and convincingly.

*In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 53} In regard to the first factor under R.C. 2152.414(D)(1) — "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child" — the trial court acknowledged that Mother and alleged Father had visited the twins, but found that the twins have "a significant bond with [their] caregivers, with whom [they] have resided since [they were] released from the hospital after birth." The trial court further found that the twins do "not have a bond or relationship with either of the paternal aunts."

{¶ 54} The record demonstrates that after the children were discharged from the hospital and placed with their foster family in March 2022, appellants' visitation with them was limited to virtual visits because appellants had lice; those visits were inconsistent, however. Eventually appellants were able to participate in in-person visits and they were consistent with those visits up until October 2022.

{¶ 55} The record further demonstrates that the twins were bonded with the foster parents. There was no concern for their safety with the foster parents and the children were doing well and getting the services they needed. The trial court's finding under R.C. 2151.414(D)(1)(a) was supported by clear and convincing evidence.

{¶ 56} In considering the wishes of the twins under R.C. 2151.414(D)(1)(b), the trial court found that the twins were too young to express their desire but noted that the GAL expressed his belief that permanent custody was in their best interest. The record shows that the GAL based his recommendation on the consistent and

positive relationship the twins had with their foster parents from their infancy. He expressed his belief that the paternal aunts were "wonderful people, but it would not be in the twins' best interest to be placed with them because they had no relationship or bond with the aunts. On this record, the trial court's finding under R.C. 2151.414(D)(1)(b) was supported by clear and convincing evidence.

{¶ 57} In regard to the custodial history of the twins, which is a consideration under R.C. 2151.414(D)(1)(c), the trial court noted that they have been in the agency's custody since March 2022. The record demonstrates that at the time the twins were placed in custody, they were newborn babies being discharged from the hospital. At the time of the trial in July 2023, they were approximately 16 months old and had been in the agency's custody their entire lives.

{¶ 58} In regard to R.C. 2151.414(D)(1)(d) — the children's need for a legally secure permanent placement and whether that could be achieved without a grant of permanent custody — the trial court found the following:

XIII. The child[ren] deserve[ ] a safe and stable environment where all of [their] needs can be met and [they] can thrive. This cannot be achieved with either parent[ ] as they have not engaged in and/or completed case plan services and have not remedied the cause for removal of the child[ren]. The paternal aunts have not been approved by the Agency and do not have a relationship with the child[ren]. No relatives have been identified as willing or appropriate to care for the child[ren].

July 12, 2023 judgments.

{¶ 59} For all the reasons discussed throughout this opinion, the trial court's findings under R.C. 2151.414(D)(1)(d) are clearly and convincingly supported by the record.

{¶ 60} The trial court made a final finding under R.C. 2151.414(D)(1). The finding was only relative to Mother and was that she had her parental rights terminated as to another child. *See* R.C. 2151.414(D)(1)(e) and 2151.414(E)(11). As previously discussed, the Agency's initial involvement with appellants concerned Mother's older child and while the within case was pending in the trial court, Mother's parental rights as to that child were terminated.

{¶ 61} On this record, the trial court's finding that permanent custody was in the twins' best interest was supported by clear and convincing evidence.

{¶ 62} We also consider Mother's contention, made in her first assignment of error, that CCDCFS failed to make reasonable efforts to help her reach her case plan objectives. According to Mother, the agency merely made referrals but did not do anything to help appellants succeed. We are not persuaded by Mother's contention. The record demonstrates that CCDCFS supported and encouraged appellants throughout this case. For example, one of the case workers repeatedly encouraged Mother to engage in parenting services and indeed Mother admitted to the case worker that her lack of participation "didn't look good." Transportation was an issue for appellants, so the agency gave them bus tickets so that they would be able to get to various services. One case worker even found a drug treatment service for alleged Father that was mostly virtual, and for the times in-person visits were

required, offered door-to-door car service. The record shows that despite CCDFCS's encouragement and support, appellants did not make significant progress on their case plans.

{¶ 63} In light of the above, Mother's two assignments of error and alleged Father's first assignment of error are overruled.

{¶ 64} In alleged Father's second assignment of error, he contends that the trial court erred by denying his motion for legal custody to one of the two paternal aunts, or alternatively, by not extending temporary custody. We disagree.

{¶ 65} The juvenile court may award legal custody of a child who has been adjudicated abused, neglected, or dependent to any person who filed a motion requesting legal custody of the child. R.C. 2151.353(A)(3). A juvenile court awards legal custody "'by examining what would be in the best interest of the child based on a preponderance of the evidence.'" *In re T.R.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 44, quoting *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 11, 14. A "preponderance of the evidence" means evidence that is "'more probable, more persuasive, or of greater probative value.'" *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin Nos. 05AP-117 and 05AP-118, 2005-Ohio-5097, ¶ 52.

{¶ 66} When considering the best interest of a child in a legal custody matter, "there is no 'specific test or set of criteria' that must be applied or considered." *In re T.R.* at ¶ 48. However, this court has found the factors delineated in R.C. 2151.414(D) to be "instructive." *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970

and 100971, 2014-Ohio-4818, ¶ 20, citing *In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 13. As discussed, the factors listed in R.C. 2151.414(D) include the interaction of the child with the child's parents, siblings, relatives, and foster caregivers; the custodial history of the child, including whether the child has been in the temporary custody of a public children services agency and for how long; and the child's need for a legally secure permanent placement.

{¶ 67} The trial court found that neither paternal aunt was approved by CCDCFS. The trial testimony established that paternal aunt R.J. was not approved because of her past involvement with the agency in regard to her own children. Paternal aunt T.R. was not approved because she lived with paternal aunt R.J. and failed to demonstrate her ability to obtain independent living apart from R.J.

{¶ 68} Moreover, and perhaps most importantly as found by the trial court, neither aunt had any bond or relationship with the twins. Indeed, they had never even seen them in person. In contrast, the twins had been with the foster parents since birth, were bonded to them, and were doing well in their care.

{¶ 69} "'Courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'" *In re S.F.*, 2d Dist. Montgomery No. 28606, 2020-Ohio-693, ¶ 50, quoting *In re A.A.*, 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19. Here, in consideration of all the best interest factors, along with the GAL's opinion that permanent custody to the agency would be in the twins' best interest, a

preponderance of the evidence supports the trial court's denial of alleged Father's request for legal custody to one of two paternal aunts.

{¶ 70} Finally, we also find no merit to alleged Father's contention that the trial court alternatively should have extended its temporary custody order. R.C. 2151.415(D)(1), governing such extensions, states:

XIV. The court may extend the temporary custody order of the child for a period of up to six months, if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.

{¶ 71} The decision whether to extend a temporary custody order is within the trial court's sound discretion, and thus our review is under the abuse-of-discretion standard. *See In re T.W.*, 12th Dist. Warren No. CA2017-06-079, 2017-Ohio-8268, ¶ 25. For the reasons discussed in this opinion, the trial court did not abuse its discretion by not extending the temporary custody order. The twins, who were approximately 16 months old at the time of trial and Mother and alleged Father had not made significant progress on their case plans. The children had been with their foster family since birth and were bonded to them and doing well. Simply, the record demonstrates that permanent custody was in the twins' best interest.

{¶ 72} Alleged Father's second assignment of error is overruled.

{¶ 73} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY EILEEN KILBANE, P.J., and
EILEEN T. GALLAGHER, J., CONCUR