[Cite as *In re F.G.*, 2024-Ohio-5709.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE F.G., ET AL.

[Appeal by the State]

:
:
:
:

No. 114025

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 5, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22905807, AD22905809, AD22905814, AD22905815,
AD22905816

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellant.*

Wegman Hessler Valore, Dean M. Valore, and Matthew O.
Williams, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} This appeal involves a child-protection matter relating to five

children, who are siblings, before the Cuyahoga County Juvenile Court in Case Nos.

AD22905807, AD22905809, AD22905814, AD22905815, AD22905816.[1] Plaintiff-

---

[1] Because the filings in all five cases are nearly identical, citations to the record will
be to Case No. AD22905807 unless a more specific citation is warranted.

appellant, the Cuyahoga County Division of Children and Family Services ("the agency"), appeals the decisions of the trial court denying the agency's motions for permanent custody and ordering the five children be placed in the legal custody of their Mother with protective supervision. The agency raises one assignment of error for our review:

> The trial court's judgments denying [the agency's] motion for permanent custody in favor of an order of legal custody to Mother with an order of protective supervision are contrary to the evidence presented at trial.

{¶ 2} For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 3} On June 7, 2022, Mother's six children were removed from her home pursuant to an ex parte telephonic order.[2] The next day the agency filed a complaint alleging that the children were abused, neglected, and dependent and requested a dispositional order of temporary custody to the agency, which was granted after a hearing that same day. The crux of the complaint was that the children witnessed domestic violence between Mother and Father.[3]

{¶ 4} At a hearing in September 2022, Mother stipulated to amended allegations of the complaint and the children were adjudicated abused, neglected,

---

[2] Mother's oldest child who was eight years old at the time of removal, has a different father, and is not subject to this appeal. The children at issue in this appeal were between the ages of one and seven when they were removed.

[3] Father was assigned an attorney, but Father did not participate in the case plan or the proceedings.

and dependent and were ordered to be placed in the temporary custody of the agency. The stipulations of fact indicated that Mother and Father have repeatedly engaged in "behaviors" in the presence of their children, one of which required law enforcement intervention, and that Mother has contact with their Father despite his propensity for violence. (Agency Motion, R. 101.) In addition, two of the children had been adjudicated neglected in 2015, and dependent in 2018, due in part to domestic violence between Mother and Father.

{¶ 5} In March 2023, the agency sought and was granted an extension of the temporary custody orders because, although Mother had completed domestic violence services, additional work was needed, and Father had "made no efforts to address the anger management and domestic violence concerns which led to the children's removal." (Agency Motion, R. 112.) The trial court noted in its entries that "there has been some progress on the case plan by Mother but more progress needs to be made in alleviating the cause for the removal of the child[ren] from the home." (Journal Entry, May 22, 2023, R. 137.)

{¶ 6} In May 2023, the agency filed a case plan amendment seeking, in part, to progress to unsupervised visits for Mother. That plan was rescinded, however, after the now nine-year-old alleged that their Father was in Mother's kitchen when the children arrived for their first unsupervised visit. Then on October 25, 2023, the agency filed a motion to modify temporary custody to permanent custody. The motion alleged that Mother had continued to maintain a relationship with the Father despite their long-standing pattern of domestic violence and despite

Mother's completion of domestic violence services and that Mother's ongoing relationship with the Father "has caused a regression in the children's clinical progress." (Agency Motion R. 149.)

{¶ 7} Trial commenced upon the agency's motions on April 12, 2024, and May 17, 2024. The following is a summary of evidence that was presented at trial.

{¶ 8} The agency established, by way of stipulated exhibits, that the two oldest children were adjudicated as neglected and placed in agency custody in 2015 due in part to the domestic violence between Mother and Father. In 2018, another incident led to the same two children being adjudicated dependent due in part to domestic violence. In both cases, Mother was required to address issues of domestic violence and mental health. Both times Mother completed the case plan, and the children were reunified with Mother. (Agency trial exhibits Nos. 11-15, R. 109.)

{¶ 9} The agency worker Sydney Petroski ("Petroski") testified that she was assigned to the case from August 2022 to July 2023, after another worker had the case for a short period of time. She testified that she did not believe Mother benefited from her previously completed domestic violence classes because she continued her relationship with the children's Father and had three more children with him who were now the subject of these proceedings. Petroski testified the current case was opened in May 2022, once again due to concerns of domestic violence in the home between Mother and Father. Petroski alleged that in June 2022, the police responded to Mother's home and Father was hiding in the house

and "the domestic violence concerns included using a weapon and strangulation." (Tr. 22.)

{¶ 10} Petroski testified that following the children's removal, the agency developed and implemented a case plan in an effort to promote the permanency plan of reunification. The case plan included services to address Mother's issues with domestic violence and mental health. Petroski testified that although Mother completed the mental health assessment, Petroski felt that the Mother minimized the effect domestic violence had on her life and did not provide true and accurate information during the assessment. Petroski opined that because Mother had expressed no concerns during the assessment, it did not include any recommendations for her. Petroski testified that Mother needed counseling to determine why there is a "pattern of domestic violence." (Tr. 26, 45.)

{¶ 11} Petroski testified that Mother maintained that she had no contact with Father throughout the pendency of this case. Petroski, however, did not believe Mother and claimed that she continued to hide her involvement with the children's Father. Petroski based this on the incident that led to the children's removal in June 2022, and allegations from the nine-year-old that their Father was in their Mother's kitchen when the children arrived two hours early for an unsupervised visit in 2024. Petroski testified that on the date of the alleged incident she dropped off the ten-year-old (from a different father) and went inside. She testified the nine-year-old was acting strange, but Petroski checked the house and the Father was not there. She also waited outside to see if she observed the father, but she did not. Later that

evening, according to Petroski, the nine-year-old child reported to the foster parent, who relayed to Petroski, that the Father was standing in Mother's kitchen eating grapes when the children arrived and then jumped out the window when he observed the children. Petroski testified that she spoke with the nine-year-old, the eight-year-old, and the seven-year-old, but ultimately only the nine-year-old child seemed to have seen the Father that day. When Petroski spoke with Mother, she denied that the Father had been there and said the children were lying. Petroski testified that Mother lived on the second floor of a double home in Lakewood, Ohio.

{¶ 12} On cross-examination, Petroski testified that she did not know if any criminal charges were pending against the Father, that Mother was cooperative with the agency, and that she completed domestic violence training for the fourth time. She testified that Mother was willing to do family counseling. Petroski testified that she had "nothing substantial" to believe that Mother was in contact with Father and that there were no indications that Father was living there. (Tr. 45.) Nevertheless, Petroski believed that Father jumped out of a two-story window as claimed by the nine-year-old. Petroski testified that the children's behaviors changed after the incident. However, any time Petroski was pressed on cross-examination about anything, like what the children said, which provider Mother used, and when the children's behaviors changed, she responded with, "I can't recall exactly." (Tr. 49, 51, 56.) When asked how many police reports were part of the case, she responded again with, "I don't recall." (Tr. 58.) Petroski believed that the Father was charged

with domestic violence in the past but did not know for certain.[4] She did not know if the Father was on the lease, because she did not ask.

{¶ 13} Next, the counselor of the nine-, eight-, and seven-year-old children testified. She testified that she started seeing the children in August 2022. The counselor diagnosed the children with post-traumatic stress disorder ("PTSD") from having witnessed "a lot of domestic violence." (Tr. 67.) The children's symptoms included nightmares, behavioral outbursts, and anxiety. She met with the children two to three times a month. The counselor testified that it took a year to build a rapport with the children because "[t]hey've been told in the past not to tell anybody about the stuff that's happened at home." (Tr. 69.) She testified that the children revealed that their parents argued and sometimes it would get physical and then they would hide in their bedrooms. The children reported that they were punched by their Father and that they are afraid of him. She testified that the children "had some bruises and whatnot when they came in." (Tr. 69.) She testified that the children trust her, their foster parents, and their teachers. They do not trust their Mother to keep them safe.

{¶ 14} The counselor testified that the foster mother called her because the nine-year-old and the eight-year-old returned home from the unsupervised visit with Mother upset and crying because their Father was there. She testified that the children typically act out the day before they have to visit their Mother and that it

---

[4] We note that a cursory review of the public dockets reveals only one misdemeanor domestic violence case for Father in 2021, where he was found not guilty. No other cases or charges are pending.

has gotten worse since the alleged incident with Father. The counselor also testified that there was another incident with Father. She stated, "I believe they were supervised at a park and there was some pizza and drinks brought to them, and they saw dad delivering it. They said that when he saw them, that he took off running and left." (Tr. 76.) Again, it was the nine-year-old who relayed this information. She also opined that family counselling would be ineffective because she felt the children would not talk in front of Mother. The counselor testified that the children do not want to go home. But they enjoy their visits with their Mother.

{¶ 15} Next, Mother was called to testify. She testified that Father no longer lived with her and he moved out June 8, 2022, the day after the children were removed. She testified that he was never on the lease. She explained that Father had a car registered to her address, but the car belonged to his sister. She indicated that she receives lots of mail for him there and that she cannot control what he does. Mother testified that she throws out the mail. Mother testified that she still has a relationship with some of the Father's family, but only the ones who support her side.

{¶ 16} Mother testified that she has a mental health provider who prescribed her medication for PTSD and anxiety stemming from the domestic violence and the death of one of her children. She went once a month to that provider and she was compliant with her medications, which have helped her. Mother testified that the domestic violence occurred off and on and that previously Father completed the case plan and would change for a while and then it would start again. She testified that

prior to the children's removal in 2022, she tried to work things out with their Father. Mother testified that originally the abuse was physical but then it changed to mental abuse.

{¶ 17} Mother testified to what she learned from the domestic violence classes and that she is keeping Father out of her life because it is "the right thing for me and my children. — Keep us both safe." (Tr. 105.) She testified that Father is using her address and taking out loans and credit cards with her information. She said she has reported it and is waiting to hear back. She testified that she is working six days a week as a housekeeper at a motel within walking distance of her house and that is why she cannot move. She does not own a car. Mother was adamant that she does not have a relationship with Father and challenged the agency to do "pop-up visits" whenever they want.

{¶ 18} Mother testified that her children should be able to trust her and she understands that they do not because they have witnessed things they should not have witnessed. She stated that for a time she was seeing a counselor once a week through Ohio Guidestone and that it helped. Mother also testified that she never rejected family counseling and that she has asked for it repeatedly. She testified that she is not in a relationship with anyone because "[r]elationships are headaches." (Tr. 112.) Mother testified that if she was smarter when she was younger, she would not be in this situation with the Father. She testified that she is working to better herself and that "nobody's gonna come before my children." (Tr. 122.) Mother also testified that she did attempt to get a restraining order but the police department

explained that she was not eligible because nothing physical happened and "they cannot just order a restraining order on [Father] just out of the blue." (Tr. 126.)

{¶ 19} Finally, Mother's current agency worker Arlethia Levison ("Levison") testified that she was assigned to Mother's case in January 2024, and that temporary custody would be expiring on June 6, 2024. Levison felt that Mother did not benefit from the domestic violence courses because Father had a car registered to her address. Although Mother testified that the car belonged to one of Father's sisters, Levison could not verify the sister. Levison also claimed that Mother was being untruthful when she testified that she was on antidepressants and anti-anxiety medications. Levison testified that Mother only informed her that she was on blood pressure medications.

{¶ 20} Levison testified that at the first visit, Mother was very upset and told the children they needed to stop lying to the agency because that is why they are not at home. Levison testified that Mother has not taken responsibility for her part in the children's removal. Levison testified that she went to the Mother's home once. She observed that she had three race car beds for the boys and one double bed for the girls. She indicated that one bed for the girls was not adequate.

{¶ 21} On cross-examination, Levison admitted she has never observed the Father or the car at Mother's home. She is concerned because Father's car is registered to Mother's address. Levison testified that she has never seen bruises on

Mother. She said Mother is adamant that Father does not live there and no one has made Levison aware that Father is living there.[5]

{¶ 22} Levison did not make a referral for family counseling, stating that the counselor recommended against it and that the Mother was inconsistent with her own mental health appointments. She admitted, however, that Mother worked with a therapist at Ohio Guidestone for over a year and six months and was discharged in March 2024. Levison testified that she did not think family counseling would benefit Mother or the children. She based this belief on the first interaction she observed with the Mother and children.

{¶ 23} At the close of the agency's case, the juvenile court asked the parties for written closing arguments. After reviewing the briefs submitted, the juvenile court denied the agency's motion for permanent custody, terminated temporary custody, and ordered the children committed to the legal custody of the Mother with protective services, stating, in pertinent part:

> The court heard sworn testimony and accepted evidence.
>
> The Guardian ad Litem recommends that the Court deny the Motion to Modify Temporary Custody to Permanent Custody and continued Temporary Custody is in the child[ren]'s best interest.
>
> The Court reviewed all written closing arguments submitted to the Court.

---

[5] We again note for the record that a cursory review of the public dockets reveal that Father has recent traffic tickets and his address is not the Mother's address. Furthermore, the clerk of courts sent notices to Father's current address, which is not the Mother's address.

> It is therefore ordered that the previous order placing the Child[ren] in the Temporary Custody of the [agency] is terminated as it is no longer in the child[ren's] best interest.
>
> It is further ordered that the child[ren are] committed to the Legal Custody of Mother, with Protective Supervision to [the agency]. Furthermore, the parties shall have no contact with Father.

(Journal Entry, June 10, 2024, R. 251.)

{¶ 24} The agency appeals the juvenile court's decision.[6]

## II. Law and Analysis

{¶ 25} Initially, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re B.B.C.*, 2024-Ohio-588, ¶ 14 (8th Dist.). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re Cunningham*, 59 Ohio St.2d 100, 106, (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).

{¶ 26} In the sole assignment of error, the agency asserts that the juvenile court erred in granting legal custody of the children to the Mother and denying the agency's motion for permanent custody. The agency argues that the judgments are against that manifest weight of the evidence.

---

[6] The agency moved for a stay of the trial court's judgment pending this appeal, which this court granted.

## Manifest Weight Standard

{¶ 27} Recently, the Ohio Supreme Court reexplained the manifest-weight-of-the-evidence standard in a parental rights case as follows:

"When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

{¶ 28} The agency's argument is twofold. First, the agency contends that it established by clear and convincing evidence the factors set forth in R.C. 2151.414(B)(1) and the factors set forth under R.C. 2151.414(D)(1). Therefore, it was in the best interest of the children to grant permanent custody to the agency. Second, the agency asserts that it established by clear and convincing evidence several conditions set forth in R.C. 2151.414(E) and all of the factors set forth in R.C. 2151.414(D)(2), which in turn requires the juvenile court to find that it was in

the best interest of the children to grant permanent custody to the agency. We find both arguments unpersuasive.

### Permanent Custody – R.C. 2151.414(B)(1)

{¶ 29} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) any one of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the best interest of the children — taking into consideration the factors set forth in R.C. 2151.414(D)(1).

{¶ 30} "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 31} R.C. 2151.414(B)(1)(a)-(e) sets forth the factors the agency must prove: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private

child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. *See In re J.S.*, 2024-Ohio-3310, ¶ 42 (8th Dist.).

{¶ 32} The record in this case reflects that all five children were removed and placed in agency custody on June 7, 2022, and the order for temporary custody was extended in May 2023. At the time the motion for permanent custody was filed, October 25, 2023, the children had been in agency custody for 12 or more months of a consecutive 22-month period satisfying R.C. 2151.414(B)(1)(d). Because the findings under R.C. 2151.414(B)(1)(a)-(d) are alternative findings, each is independently sufficient to establish one prong of the two-part test to grant a motion for permanent custody. *In re Dalton*, 2007-Ohio-5805 (5th Dist.); *In re K.C.*, 2024-Ohio-2081, ¶ 45 (10th Dist.); *In re A.J.*, 2024-Ohio-3291, ¶ 42 (5th Dist.). This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 2008-Ohio-5458 (5th Dist.); *In re K.C.*

{¶ 33} Having determined that the agency established that the children have been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, we turn to the agency's arguments that it was in the best interest of children to grant permanent custody to the agency pursuant to R.C. 2151.414(D)(1).

## Best Interest Determination — R.C. 2151.414(D)(1)

{¶ 34} R.C. 2151.414(D)(1) requires that the juvenile court consider all relevant factors in determining whether the children's best interests would be served by granting the permanent custody motion. These factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem ("GAL"); (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1). A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, at ¶ 46, citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.).

{¶ 35} The agency asserts that several of the factors listed in R.C. 2151.414(D)(1) were proved by clear and convincing evidence. Specifically, the agency claims that Mother minimized the domestic violence and the effects it had on the children; that the children did not feel their Mother could keep them safe; and that the Mother blamed the children for their removal. According to the children's attorney, the two older children wanted Mother's parental rights

terminated and to remain with their foster parents. The GAL for the children recommended that the children remain in temporary custody of the agency. Based on these reasons, the agency maintains that it established that it was in the best interest of the children for the agency to be granted permanent custody and that the juvenile court's denial of permanent custody was against the manifest weight of the evidence.[7] We disagree.

{¶ 36} Despite what the agency argues, the testimony reveals that Mother completed everything in the case plan that was within her control. Further, Mother demonstrated that she learned from her domestic violence classes and how domestic violence affects her children. Mother testified that she did protect the children from their Father, standing in the way of him to her own detriment. Yet the agency and the children's GAL seemed determined to blame the Mother for the abuse she suffered, as noted by the following exchange:

> [Agency]: You identified the father as the bad guy. Do you acknowledge what role you played in the children's removal almost two years ago?
>
> [Mother]: I did protect them. That's why I was getting abused. They wasn't getting abused. I was getting abused. . . . Them kids was never abused. The kids have been abused since they've been in the County. My daughter had stitches in her eye. My other daughter had a hairline

---

[7] The agency asserts that the juvenile court did not apply the best interest factors because the judgment entry makes no mention of the statutory considerations. However, the Ohio Supreme Court held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires. Although a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors, we may not graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

fracture in her hand. My son came with a big skid on his face, and knots on their head, bruises. They got scratches on them every time they come. That never happened in my household. I protect my kids. I would never let anybody harm my kids.

(Tr. 119-120.)

> The GAL for the children then asked Mother: you responded to a question posed by [the prosecutor], "I shouldn't have never let him hurt me." Do you remember saying that?
>
> [Mother]: Yes.
>
> [GAL]: Okay. But you did, will you agree?
>
> [Mother]: I did.
>
> [GAL]: Okay. Why did you? Why did you allow him to hurt you?
>
> [Mother]: I guess I wasn't strong enough or I thought I wasn't strong enough at that time[.]

(Tr. 123-124.)

{¶ 37} The record is clear that Mother has never been accused of domestic violence, and we find it troubling that Mother was blamed for Father's behavior. Also troubling is that the counselor testified that she observed "bruises and whatnot" on the children when she began counseling them. Thereafter, counselor assumed that the children were truthful when they told her that their Father punched them. However, the children started counseling two months after their removal from Mother and Father, which corroborates Mother's testimony that the children had been hurt since their removal, and not at the hands of Mother or Father. Finally, Mother adamantly denied having contact with Father, and there was no credible evidence to suggest otherwise.

{¶ 38} The Ohio Supreme Court has explained that the

> "[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their [judgment], if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990); *In re JA.B.*, 2024-Ohio-453, ¶ 34 (8th Dist.). Furthermore, this court has stated that

> "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *Id.*, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952)."

*In re JA.B.*, at ¶ 36, quoting *In re C.T.*, 2006-Ohio-1944, ¶ 15 (8th Dist.).

{¶ 39} Here, the juvenile court clearly considered all of the evidence and arguments of counsel and determined that the agency did not prove by clear and convincing evidence that permanent custody was in the best interest of the children. And after reviewing the entire record, we cannot say the juvenile court lost its way when it denied the agency's motion for permanent custody under R.C. 2151.414(D)(1).

## Permanent Custody — R.C. 2151.414(D)(2)

{¶ 40} In their second argument, the agency maintains that the juvenile court was required to grant the motion for permanent custody under R.C. 2151.414(D)(2).  R.C. 2151.414(D)(2) dictates that permanent custody is in the best interest of the children and the court shall commit the children to the permanent custody of a public children services agency if all of the following apply:

> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

> (d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

The agency asserts that it proved several of the conditions listed in R.C. 2151.414(E), as well as the remaining factors set forth in R.C. 2151.414(D)(2); therefore, a grant of permanent custody to the agency was required.

{¶ 41} According to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  The court is only required to find one of the R.C. 2151.414(E) factors present in order to enter a finding that a child

cannot or should be placed with a parent. *In re D.H.*, 2022-Ohio-2780, ¶ 29, citing *In re L.W.*, 2019-Ohio-1343 (8th Dist.). Nevertheless, the juvenile court still must make a best interest determination. R.C. 2151.414(B)(2).

{¶ 42} The agency maintains that it established the following factors set forth in R.C. 2151.414(E):

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]
>
> . . .
>
> (10) The parent has abandoned the child.
>
> . . .
>
> (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
>
> (16) Any other factor the court considers relevant.

{¶ 43} The agency argues that Mother failed to remedy the conditions that caused the children to be removed from her home. Specifically, the agency alleges that Mother remained in an abusive relationship with the children's Father, repeatedly choosing Father over the children and she did not resolve her mental health issues. The agency alleges that Father abandoned the children and the children were afraid of their Father and did not trust their Mother to protect them.

{¶ 44} The record, however, reflects that the Mother completed multiple domestic violence programs and could clearly articulate what she learned regarding the patterns of an abusive partner and testified that she no longer would allow herself to be treated that way. Further, Mother testified that she had not had any contact with the Father since the children were removed nearly two years earlier. Although there was some testimony that the Father was observed eating grapes in the Mother's kitchen and then jumped out a two-story window when the children arrived for a visit, this testimony was not firsthand knowledge, nor corroborated by anyone with firsthand knowledge, nor was it particularly credible. Finally, the case plan was implemented with the goal of reunification and the evidence revealed that the Mother had been engaging in counseling, had been taking her medications as prescribed, and had been completing everything in her case plan that was in her control.

{¶ 45} After reviewing the evidence in this case, we cannot say that the juvenile court's judgment was against the manifest weight of the evidence when it denied the agency's motion for permanent custody, terminated temporary custody,

and placed the children in the legal custody of their Mother with protective supervision.

{¶ 46} Accordingly, the agency's sole assignment of error is overruled.

{¶ 47} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR