[Cite as *In re T.H.*, 2024-Ohio-1372.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.H., ET AL.                      :

Minor Children                          :          No. 113277

[Appeal by R.H., Father]                :

                                        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 11, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22901108

---

### *Appearances:*

Barbara Martincic, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Appellant-Father, R.H., appeals the trial court's decision to grant permanent custody of two of his children to the Cuyahoga County Division of

Children and Family Services ("CCDCFS" or "agency"). After a considered review of the facts and the law, we affirm.

{¶ 2} Two children are at issue here: T.H. and Ti.H. The agency became involved with the family in 2021 when it was alleged that the children's mother was abusing fentanyl and marijuana while pregnant with another child (the sibling is not at issue in this appeal). Father had endangered the children, and Father engaged in domestic violence against Mother.[1] Mother and Father are not married, and the children resided solely with Mother. The agency developed case plans for Mother and Father to address issues with substance abuse, mental health, parenting, and domestic violence. Father additionally had anger management, basic needs, and housing as part of his case plan.

{¶ 3} On February 1, 2022, the agency filed a complaint for abuse and neglect requesting temporary custody of both children after Mother tested positive for drugs while giving birth to the children's sibling. In March 2022, the children were adjudicated dependent and placed in the emergency custody of the agency. On April 13, 2022, the agency received temporary custody of the children. In June 2022, the agency unilaterally stopped visitation "due to aggression and inappropriate behaviors by [Father] during the visits" and filed a motion for an emergency change in the case plan, citing Father's behavior at visits with the children. According to the agency, Father inappropriately roughhoused with his daughters to the point that his

---

[1] Mother has not appealed the trial court's grant of permanent custody; therefore, the facts discussed in this case will mainly pertain to Father.

behavior was referred to the agency's sex abuse investigation unit. It was concluded that there was not enough to substantiate that Father was "priming" or "grooming" his daughters but that the agency should "keep a close lookout for the children." The agency case worker testified at a hearing on the motion that "dad had been acting inappropriately more than once and every time we tried to address him with the issue, dad would become irate * * * and threatening to the point that security had to escort him several times out of the building." The social worker further testified that the confrontations with Father were almost "physical confrontations" and every time he came for visits with his daughters he was "just hollering and screaming."

{¶ 4} The case worker's main concern occurred on June 23, 2022, during a visit where Father's arm was placed in an inappropriate position relative to Ta.H. When the case worker tried to redirect Father and pointed out his inappropriate behavior, Father became irate and began to scream and swear at her.

{¶ 5} According to the agency worker, security had to get involved with Father during five visits in April and May 2022. At his last visit, in June 2022, Father "shoulder-checked" the agency receptionist as he was leaving the building. Despite the agency's concerns, based on the guardian ad litem's ("GAL") recommendation that supervised visits continue, the trial court determined that supervised visitation would take place at a new location and with a new case worker.

{¶ 6} In December 2022, the agency moved to modify temporary custody to permanent custody.

{¶ 7} In January 2023, the trial court suspended Father's supervised visitation with the children after an outburst during a supervised visit with the children.

{¶ 8} The motion for permanent custody was heard on September 5, 2023. CCDCFS supervisor Sarah Narine testified that the agency attempted to engage Father in his case plan services but was unsuccessful, mainly due to Father's volatile behavior. Narine testified that the agency had difficulty dealing with Father:

> [He] does not listen. He aggressively talks over myself or any worker or advocate that is with me. He does not want to listen or process what we're trying to tell him to help him in regard to his case plan services. He gets verbally aggressive. * * * Yelling. There's some cursing at times. So it's very difficult to communicate with him.

{¶ 9} According to Narine, Father had acted "very aggressive" with each of the four agency workers that had been assigned to the family and exhibited volatile behavior whenever he interacted with the agency. She testified that Father was unable to regulate his temper and his aggression "increased" as time went on: "Once [Father] starts on one topic, he just escalates and continues to go and there's really no communicating or getting through to him at that point. He does not seem to be able to regulate his anger because it continually increases."

{¶ 10} Nadine testified that the agency was additionally concerned because although Father had taken some anger management classes, it was evident he had not benefitted from the service. In addition, the trial court assigned Father a GAL to help him "manage courtroom behaviors."

{¶ 11} A video from the January 2023 visit, which was played for the court, showed that security had to intervene, and the visit was cut short due to Father's behavior; his behavior left both children upset, crying, and pleading for him to stop. The family advocate assigned to the case, Amanda Whitman, testified that Father's behavior escalated and worsened as security removed Father from the building. She further testified that in the weeks prior to the hearing, Father sent a barrage of text messages to her in response to the agency's request for a urine screen. Father sent two series of text messages, more than 20 text messages each time, in which he called the worker names and used other inappropriate language.

{¶ 12} Father was referred to substance abuse services on multiple occasions but failed to follow through with services as referred. Although Father maintained that he had a medical marijuana card, he failed to provide sufficient documentation to validate his claim. According to the agency, Father had not made progress in addressing his substance abuse concerns and did not have an established sobriety date. Father continued to test positive for cannabis, alcohol, and, at least on one occasion, methamphetamine.

{¶ 13} Mark Pountney, the current agency case worker, testified that there was a civil protection order between Mother and Father; Father was the petitioner. According to Pountney, Father failed to sufficiently engage in mental health services, failed to demonstrate benefit from the parenting and domestic violence services he did attend, and only recently obtained housing.

{¶ 14} Pountney testified that in all his interactions with Father, Father was calm only on one occasion and other than that occasion, Father would "talk in an aggressive, overbearing manner," interrupting Pountney and also "interrupt and overtalk other [a]gency staff."

{¶ 15} Pountney conceded he had yet to assess Father's housing but testified that it was because it was required that a detective accompany him for his safety, and he was unable to secure the detective. According to Pountney, Father had not benefitted from domestic violence services because "in order to benefit from domestic violence [services] it would require someone to better manage their anger, and I have not seen him better manage his anger." As to the substance abuse portion of his case plan, Pountney noted that Father was not compliant with drug screens, and when Father did submit to tests, the tests would come back positive for marijuana, alcohol, and, on at least one occasion, methamphetamine. Pountney testified that although Father had had some counseling, he was unable to show that he benefitted from the mental health component of his case plan, because he was unable to "appropriately deal with his anger" or control his emotions.

{¶ 16} As of the hearing date, the children were six and eight years old and placed with a paternal aunt, where they were doing well. The aunt was willing and able to adopt both children should the agency be granted permanent custody of the children. Both children were engaged in counseling services.

{¶ 17} Father testified he had housing, which he secured in the weeks prior to the permanent custody hearing but did not yet have a stove or refrigerator.

Father's 17-year-old daughter from another relationship lived with him. Father testified that he was employed as a traveling barber. He acknowledged that he went to prison in 2017 to serve an 18-month term for attempted domestic violence against Mother and had also served time for felony drug offenses.

{¶ 18} Father's 17-year-old daughter testified that she was currently living with Father and had lived with him "for a few months" because her mother was ill. Prior to moving in with Father, she had not seen him since she was 12. The daughter described Father as "very respectful and calm" and stated that he helped her with schoolwork.

{¶ 19} At the conclusion of the hearing, the children's GAL reaffirmed the recommendation from her written report, which was to grant permanent custody of the children to the agency.

{¶ 20} The trial court subsequently journalized an entry for each child in which it terminated all parental rights and ordered the children placed in the permanent custody of CCDCFS.

{¶ 21} Father filed a notice of appeal and raises one assignment of error in which he argues that the trial court erred in finding there was clear and convincing evidence to grant permanent custody of the children to the agency.

{¶ 22} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty

interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 23} Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant a public children services agency's motion for permanent custody if it determines, by clear and convincing evidence, that permanent custody is in the best interest of the child and, as is pertinent to this appeal:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(B)(1)(a).

{¶ 24} This court has previously held that it will not reverse a permanent-custody decision if there is "competent and credible evidence" in the record from which the trial court could have found that the statutory elements for permanent custody were established by clear and convincing evidence. *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, citing *In re A.P.*, 8th Dist. Cuyahoga

No. 104130, 2016-Ohio-5849, ¶ 16. "In other words, the trial court determines whether there is clear and convincing evidence to support the statutory factors for permanent custody (R.C. 2151.414(B)(1)) and this court determines whether there is competent and credible evidence in the record to support the trial court's findings." *In re M.A.*, 8th Dist. Cuyahoga No. 112411, 2023-Ohio-3251, ¶ 41. In *In re M.A.*, we further stated that "[t]he appellate court cannot overturn a trial court's finding 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.'" *In re M.A.* at *id.*, quoting *In re Adkins*, 5th Dist. Tuscarawas Nos. 2005 AP06-0044 and 2005 AP07-0049, 2006-Ohio-431, ¶ 17, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 25} Shortly after *In re M.A.* was released, the Supreme Court of Ohio clarified the standard of review:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, * * * the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 11. The court noted that "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be

used as a substitute for the separate sufficiency and manifest-weight analyses appropriate for permanent-custody determinations." *Id*. at ¶ 15.

{¶ 26} On appeal, Father makes manifest-weight-of-the-evidence arguments. Regarding a challenge based upon manifest weight of the evidence, the Supreme Court of Ohio has explained:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their [judgment], if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics but depends on its effect in inducing belief."

*In re JA.B.*, 8th Dist. Cuyahoga Nos. 113056 and 113087, 2024-Ohio-453, ¶ 34, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12.

{¶ 27} The agency moved for permanent custody of the children pursuant to R.C. 2151.414(B)(1)(a) and 2151.414(D)(1).[2] Father claims that the agency was unable to prove, by clear and convincing evidence that the children could not be placed with him within a reasonable time period.

{¶ 28} The trial court found pursuant to R.C. 2151.414(B)(1)(a) that the children could not be placed with either of their parents within a reasonable time or

---

[2] Father does not challenge the trial court's findings on appeal that a grant of permanent custody to CCDCFS was in the best interest of the children; therefore, we limit our discussion to a review of whether there was competent credible evidence supporting the trial court's findings under R.C. 2151.414(B).

should not be placed with the parents. In making this finding, the trial court relied on the factors set forth in R.C. 2151.414(E). Specifically, R.C. 2151.414(E) states, in pertinent part, that "[i]f the court determines, by clear and convincing evidence, * * * that one or more of the [enumerated (E) factors] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"

{¶ 29} Here, the trial court relied on R.C. 2151.414(E)(1), (2), and (4). Under R.C. 2151.414(E)(1), the trial court found that Father had failed to remedy the conditions that led to the removal of the children. CCDCFS established a case plan for Father, which required him to work on issues relative to housing, basic needs, mental health, anger management, domestic violence, and substance abuse. Father engaged in mental health, domestic violence, and anger management classes, but the record reflects that he did not benefit from the classes. In its decision granting permanent custody, the court noted that the father had had multiple case workers over the course of the case "due to his aggression and anger." We note that the court issued an order halting Father's visitation with his children after a January 2023 incident, which was on video, in which Father had to be removed by security due to his behavior. The record reflects that Father had to be removed from visits with his children numerous times by security due to his angry and aggressive behavior. And Father's volatile behavior was not limited to agency workers; the trial court had to appoint a separate GAL for Father to manage his courtroom behavior.

{¶ 30} Multiple agency workers testified that Father was angry and aggressive in his conversations with agency employees. This included yelling, swearing, sending inappropriate text messages, "over-talking," getting into agency workers' personal space, and shoulder-checking an agency receptionist.

{¶ 31} A video recording of an incident that occurred during a January 2023 supervised visit led to court-ordered suspension of Father's visitation. The video showed security intervening with Father because the children were crying and upset, as well as Father making inappropriate statements to the children. Whitman testified that Father's behavior worsened after Father was led outside by the security. The record also reflects that Father's aggressive behavior continued right up until trial, as evidenced by two series of "rapid fire" text messages Father sent to Whitman prior to the hearing, each series consisting of at least 20 text messages.

{¶ 32} Father also has not shown that he complied with the substance abuse component of his case plan. Father was referred to substance abuse services on multiple occasions but failed to follow through with services as referred. Father failed to submit the required documentation showing he possessed a medical marijuana card, did not submit urine screens as requested, and continued to test positive for marijuana, alcohol, and, at least on one occasion, methamphetamine. Father also was unable to establish a sobriety date.

{¶ 33} As to the housing and basic needs components of his case plan, although Father recently secured housing, he did not have a refrigerator or stove. The agency was also unable to check Father's house because, due to Father's

behavior, case workers were required to have a detective escort and as of the hearing date had not been able to arrange an escort.

{¶ 34} On this record, the weight of the evidence clearly and convincingly supports the trial court's "failure to remedy" finding.

{¶ 35} Under R.C. 2151.414(E)(2), the trial court found that Father's

> [c]hronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent * * * is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

{¶ 36} The record supports the trial court's findings. As to Father's mental health, testimony established that he had been diagnosed with anxiety disorder, panic disorder, and major depressive disorder, but did not consistently engage in mental health services. With regard to Father's chronic substance abuse, testimony established that Father was referred to substance abuse services on multiple occasions but failed to follow through with services as referred. Father failed to provide sufficient documentation to validate his claims relative to a medical marijuana card and continued to test positive for cannabis, alcohol, and/or methamphetamines. Father also did not have an established sobriety date.

{¶ 37} The record therefore supports the trial court's findings under R.C. 2151.414(E)(2).

{¶ 38} Under R.C. 2151.414(E)(4), the trial court found that Father had "demonstrated a lack of commitment" to the children by failing to "regularly

support, visit or communicate with the child[ren] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren]."

{¶ 39} Father argues that he was prevented from visiting with his children. The agency had previously tried to halt supervised visits, after the case worker observed Father acting inappropriately towards one of the children. The court determined, however, that visits would continue at a new location and with a different case worker. Despite this, Father continued to display aggressive behavior, so the court eventually stopped visitation. Father has failed to show that he addressed his anger and aggression issues, a prerequisite to reestablishing visitation.

{¶ 40} Father also points to the fact that his 17-year-old daughter lives with him and describes him as a good parent. The daughter testified, however, that she had just recently moved in with her father and, before that, she had not had any contact with him for several years. But the needs of a six- and eight-year-old child, the ages of the children at issue here, differ greatly from those of a child nearing adulthood; moreover, an older child is in a better position to protect herself, should that be necessary, than those of tender years.

{¶ 41} Father either failed or refused to engage in many of the services the agency referred him to so that he could demonstrate his willingness or ability to provide adequate care for the children.

**{¶ 42}** Given this evidence, the trial court's finding as to lack of commitment was supported by clear and convincing evidence in the record.

**{¶ 43}** Finally, as mentioned, Father does not challenge the trial court's finding that permanent custody was in the best interest of the children. After our review of the record, we conclude that the trial court's determination that a grant of permanent custody is in the children's best interest and not against the manifest weight of the evidence.

**{¶ 44}** We recognize that Father loves his children and was willing to care for them. However, Father did not progress on his case plan by either refusing to engage in services or by failing to benefit from the services. The trial court's decision to grant permanent custody to the agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

**{¶ 45}** The sole assignment of error is overruled.

**{¶ 46}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EMANUELLA D. GROVES, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR