[Cite as *In re I.E.*, 2024-Ohio-5487.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE I.E., ET AL.     :
           :    No. 114069
Minor Children      :
           :
[Appeal by Mother, S.E.]   :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 21, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-22903175, AD-22903176, and AD-22903177

---

### *Appearances:*

Wargo Law, LLC, and Leslie E. Wargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} S.E. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her three children I.E., Isa. E. and Ish. E. ("Children") to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). Mother argues that the court's decision was not supported by sufficient evidence in the record and was against the manifest weight of the evidence.

After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I. Procedural History

{¶ 2} On March 29, 2022, CCDCFS filed a complaint that alleged that the Children were neglected and dependent and requested a predispositional order of temporary custody to CCDCFS. On March 30, 2022, the court granted the motion and the Children were placed into the predispositional temporary custody of CCDCFS. On August 26, 2022, the Children were adjudicated neglected and dependent and were committed to the temporary custody of CCDCFS.

{¶ 3} On February 10, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody for the Children. After a hearing on the motion, it was denied. An extension of the temporary custody order was granted.

{¶ 4} CCDCFS filed a second motion to modify temporary custody to permanent custody for the Children on September 27, 2023. The hearing was held on May 7, 2024. On May 13, 2024, the trial court granted CCDCFS's motion, awarded permanent custody of the Children to CCDCFS, and terminated Mother's parental rights. It is from these orders that Mother appeals, raising one assignment of error for our review:

> The trial court's judgments granting permanent custody to the agency were not based upon sufficient clear and convincing evidence, were against the manifest weight of the evidence and it erred in finding permanent custody to be in the best interests of the children.

## II. Hearing Testimony

{¶ 5} The following testimony and evidence were presented at the May 7, 2024 hearing on CCDCFS's motion for permanent custody.

### A. Traci Porter

{¶ 6} Traci Porter ("Porter") testified that she was employed by CCDCFS in the extended-services department. She was co-assigned to the Children's case in April 2022 and took over sole responsibility for the case in July 2022. Porter testified that S.E. is Mother and I.B. is Father because paternity had been established for each child. At the time CCDCFS became involved with the Children, Mother had sole custody of them.

{¶ 7} Porter recalled that the Children came into CCDCFS custody due to deplorable home conditions such as no electricity or water. Additionally, Mother had sobriety issues and was intoxicated when CCDCFS went to the home. The Children have remained in CCDCFS custody since the initial removal at the start of this case in March 2022.

{¶ 8} CCDCFS created a case plan for the family to facilitate reunification. Mother's objectives included random drug screens, mental-health improvement, housing, employment, and domestic-violence counseling.

{¶ 9} Porter stated that as of trial she did not know where Mother was residing and that, to her knowledge, Mother never had stable housing. Mother also had mental-health issues, which is why the mental-health section of her case plan required Mother to see a therapist and have mental-health case management and

medication management. CCDCFS made several referrals to Signature Health, Moore Counseling, Murtis Taylor, and New Vision. Mother completed one mental-health assessment in July 2023 where medication was prescribed. Mother never went back for treatment and she never took the prescribed medication. Porter had active concerns about Mother's mental health because she is still not being treated for it.

{¶ 10} Domestic-violence services were part of the case plan because Mother had exhibited erratic and angry behavior with the Children and had gotten into physical altercations with people during visits with the Children.

{¶ 11} Substance-abuse assessment and treatment were included as part of Mother's case plan because she had openly admitted to smoking marijuana. She had been intoxicated during conversations with Porter. Mother was referred to an outpatient program, from which she was dismissed for failure to participate. CCDCFS required Mother to get drug tested two to three times a month. Mother only completed two drug screens for CCDCFS, one in 2022 and one in 2023.

{¶ 12} Porter testified that Mother had not been in contact with CCDCFS for the three months prior to trial, and Porter had been unable to communicate with Mother during that time. A couple of weeks prior to trial, the Children told Porter they had had contact with Mother and gave Porter a phone number for Mother. When Porter finally was able to communicate with Mother, Mother explained that she was unavailable for three months because she was "trying to get herself together," so she "had to take a step back" to do that.

{¶ 13} Mother did not have any in-person visits with the Children during the three months prior to the hearing on the permanent custody motion even though supervised visitations were scheduled for every other week. The visitations were originally weekly, but because of Mother's inconsistency in attending visits, the visits went to every other week. Twice, Porter involved security during a visit because of Mother's angry and erratic behavior in front of the Children, who have normalized her behavior. The Children have beseeched Mother to stop the angry erratic behavior so the visits would not be canceled. Porter recalled a positive visit Mother had with the Children during which she admitted to them that she knew she had not done what she was supposed to have done to comply with her case plan, but made sure they knew she loves them. When Mother showed up for visits, during most of them she was playful with the Children.

{¶ 14} Porter testified that in early 2024, Mother had provided some paystubs to her from 2023, but Mother had provided nothing for 2024 before the May 2024 hearing. As far as Porter knew, Mother had been living at a friend's house, despite being provided several referrals to housing programs. Porter did not know where Mother was living at the time of the hearing because she had been missing for three months.

{¶ 15} Regarding the Children's Father, Porter testified about his involvement with the Children as follows: Father had visits scheduled for every other week, but he attended only four visits, with the last visit occurring in the middle of 2023. Porter testified that Father has not engaged with the Children and they have

not had any contact with him in 2024. He had a case plan that involved needing to secure stable housing for reunification. Throughout this case, Father lived in a one-bedroom apartment with his mother so there was no room for the Children. Father told Porter he knew he could not take care of the Children. Porter did not believe Father would be able to care for the Children.

{¶ 16} The Children have been placed together in a foster home since August 2022. They have bonded well with their caregivers. They are in a disciplined environment; the foster family is providing stable housing and meeting basic needs. The Children are currently in school and participate in extracurricular activities.

{¶ 17} Porter explained that the Children were first placed with their maternal grandmother, but maternal grandmother did not have room for all three Children in her single-bedroom home. There was also an issue with Mother who interfered with maternal grandmother's ability to parent the Children. Mother made threatening calls and overstepped maternal grandmother's house rules and boundaries regarding the Children.

{¶ 18} In Porter's professional opinion, it is in the Children's best interest to be in the permanent custody of CCDCFS so that they have stable housing and their basic needs are met. Porter testified that Mother's reunification plan with the Children required her to establish sobriety, stable housing, mental health, and consistent employment; Mother failed to establish any of those. In making her recommendation, Porter highlighted that Mother has been noncompliant with taking medication for her mental health because she does not believe she needs it.

{¶ 19} The Children have been in CCDCFS's custody since March 2022. CCDCFS's motion for permanent custody was filed on September 27, 2023. They have been in their current foster home since August 2022. They are comfortable in their foster care. The Children informed Porter that they desire to stay in the foster home. Mother failed to appear at any of the scheduled visits over the three months preceding the hearing on permanent custody. The Children have been doing well without visits with Mother.

### B. Guardian Ad Litem's Report

{¶ 20} The court also reviewed the report provided by the Children's guardian ad litem ("GAL"). The report was filed on April 30, 2024. The GAL conducted interviews with the Children, their foster parents, Mother, Father, CCDCFS workers Shannon Fraser and Porter, as well as the court-appointed special-advocate ("CASA") attorney. The GAL reported that neither Mother nor Father have made any progress on their case plans. The GAL noted that that Children were comfortable in the foster home. They expressed that they like living there and have a good relationship with their caregivers. Based on his investigation of the case, the GAL recommended the Children be committed to the permanent custody of CCDCFS.

### C. Court-Appointed Special-Advocate's Report

{¶ 21} The trial court also reviewed a report from the CASA attorney that was filed on May 1, 2024. The report indicated that Mother made no progress with her case plan in over two years. There was no reason to think in the foreseeable

future that she would be capable of taking care of the Children. The report stated that the CASA attorney had visited the Children at their foster home several times and found them to be well cared for. In conclusion, the CASA attorney recommended that permanent custody be granted to CCDCFS.

## III. Law and Analysis

### A. Standard of Review — Permanent Custody

{¶ 22} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 2020-Ohio-906, ¶ 16 (8th Dist.). "To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

{¶ 23} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Ohio Supreme Court recently clarified that, when reviewing a juvenile court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties" rather than an abuse-of-discretion standard. *In re Z.C.,* 2023-Ohio-4703, ¶ 18.

{¶ 24} "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re P.S*, 2023-Ohio-144, ¶ 30 (8th Dist.).

**B. R.C. 2151.414(B)(1) Factors**

{¶ 25} The first prong of the test requires the finding of any factors in R.C. 2151.414(B)(1)(a)-(e). "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 26} The trial court found that R.C. 2151.414(B)(1)(a) was satisfied as to each of the Children; however, we disagree. Section (B)(1)(a) is satisfied if the child has not been abandoned or orphaned or has not been in agency custody for 12 or more months of a consecutive 22-month period and "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." The trial court found that the Children have not been in the custody of the agency for 12 months or more in a consecutive 22-month period. However, the undisputed evidence establishes that the Children have been in CCDCFS's custody for over 12 months in a 22-consecutive month period, which satisfies R.C. 2151.414(B)(1)(d). "[T]he time period for R.C. 2151.414(B)(1)(d) is calculated from when the child enters custody of the agency [to] the filing of the motion for permanent custody." *In re J.C.*, 2018-Ohio-2234, ¶ 29 (8th Dist.). The

Children were placed into CCDCFS custody on March 28, 2022, and the permanent custody motion was filed on September 27, 2023, 18 months later. The Children were continuously in the custody of CCDCFS for that entire 18-month time period. The record clearly and convincingly establishes that R.C. 2151.414(B)(1)(d) has been satisfied. Consequently, the conditions for applying R.C. 2151.414(B)(1)(a) have not been met.

{¶ 27} Appellate courts may decide an issue on grounds different than those determined by the trial court when the evidentiary basis for the court of appeal's decision is a legal issue that must have been adduced before the trial court and was a part of the record. *State v. Peagler*, 76 Ohio St.3d 496 (1996), paragraph one of syllabus.

{¶ 28} Because only one (B)(1) factor is needed, the first prong of the two-part analysis is satisfied, and we need not consider the trial court's superfluous finding under R.C. 2151.414(B)(1)(a). *In re J.F.*, 2024-Ohio-3407, ¶ 16 (8th Dist.). Next, we consider the second prong of the two-part analysis, namely whether terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the Children. This is determined by applying the five best-interest factors in R.C. 2151.414(D).

### C. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 29} In its May 13, 2024 journal entry, the court indicated it had considered each of the best-interest factors identified under R.C. 2151.414(D)(1):

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child

The trial court stated in its entry that it concluded "by clear and convincing evidence that it is in the best interest of the child[ren] to grant permanent custody to [CCDCFS]."

{¶ 30} Subsection (a) concerns the relationship between the Children with their family and foster caregivers. The trial court heard evidence concerning the Children's relationships with their Mother and foster parents. Mother clearly loves her Children, and she attended some visits, but she also cancelled many visits. Mother stopped attending entirely for the last three months before trial. At least twice during visits, security had to be called because of Mother's angry and erratic behavior. Testimony was also presented that the Children have bonded well with

their foster caregivers and were unaffected during the months Mother did not visit with them from March to May 2024. This evidence clearly and convincingly supports the trial court's best-interest finding under subsection (a).

{¶ 31} Subsection (b) concerns the wishes of the Children. Porter testified that the Children would rather stay with their foster parents in their foster home:

Q. Okay. And is it fair to say that as of now, their desire would be to stay in that foster home?

A. Yes.

The GAL and CASA attorneys both opined that the best interest of the Children was permanent custody with CCDCFS. The GAL report noted that the Children were comfortable in the foster home, they expressed that they like living there, and they have a good relationship with their caregivers. This evidence clearly and convincingly supports the trial court's best-interest finding under subsection (b).

{¶ 32} Subsection (c) concerns whether the Children have been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period. As addressed, the record establishes that the Children were placed with CCDCFS on March 28, 2022. The motion for permanent custody for the Children was filed on September 27, 2023, 18 months later and well over the 12 months required under subsection (c). This clear and convincing evidence supports the trial court's best-interest finding under subsection (c).

{¶ 33} Under subsection (d), the court must consider the Children's need "for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody." "Although the Ohio Revised

Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re L.M.*, 2024-Ohio-1435, ¶ 47 (4th Dist.), quoting, *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re M.B.* at ¶ 56.

{¶ 34} In the case before us, clear and convincing evidence supports the trial court's finding that the Children need a legally secure permanent placement and that they can only achieve this type of placement by granting the agency permanent custody. Mother is not able to provide a secure permanent placement for the Children and cannot be considered dependable. She failed to reliably attend scheduled visitations throughout the time following the initial removal of the Children. Mother is not able to provide for the Children's basic needs. Mother has failed to complete any of her plan objectives, which included a stable-housing objective. The only evidence of a stable environment with dependable adults who meet the Children's basic needs is found with their foster parents. The evidence clearly and convincingly supports the trial court's best-interest finding under subsection (d).

{¶ 35} Under subsection (e), the court indicated it considered whether any factors in division (E)(7) to (11) apply in relation to the parents and the Children. In

its May 13, 2024 journal entry, the trial court found subsection (E)(10) applied, because the court made a finding that "the parent has abandoned the [Children]." However, a review of the evidence does not support this finding. R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." *In re L.D.*, 2017-Ohio-1037, ¶ 34 (8th Dist.).

{¶ 36} Here, there is not sufficient evidence to establish that Mother did not make contact with the Children for more than 90 days. The evidence instead shows that, even though CCDCFS was unable to get in contact with Mother for the three months prior to the hearing, Mother was still maintaining contact with the Children. The Children told Porter she had been contacting them and even provided Porter with a new phone number for Mother. As such, we find the clear and convincing evidence here establishes that subsection (e) does not apply.

{¶ 37} Our review of the record shows that clear and convincing evidence supports the trial court's findings under R.C. 2151.414(D)(1)(a)-(d) such that permanent custody with CCDCFS is in the best interest of the Children.

### D. Trial Court Findings Pursuant to R.C. 2151.414(E)

{¶ 38} While R.C. 2151.414(E) findings are not necessary because R.C. 2151.414(B)(1)(d) applies in this case, the trial court made findings in its journal entry pursuant to R.C. 2151.414(E), and Mother argues in her brief that there is not sufficient evidence to support the trial court's findings against her under (E)(1),

(E)(4), and (E)(10). We disagree as it relates to (E)(1) and (E)(4), but as discussed, we agree with Mother that evidence does not support abandonment under (E)(10).

{¶ 39} R.C. 2151.414(E) states, in pertinent part, that "'[i]f the court determines, by clear and convincing evidence, * * * that one or more of the [enumerated (E) factors] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]'" *In re JA.B*, 2024-Ohio-453, ¶ 39 (8th Dist.), quoting R.C. 2151.414(E). In this case, in its journal entry the court found that the Children cannot be placed with one of the Children's parents within a reasonable time or should not be placed with either parent, applying R.C. 2151.414(E)(1), (E)(4), and (E)(10) as follows:

> The Court finds that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to O.R.C. 2151.414(E):
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
>
> (10) The parent has abandoned the child.

{¶ 40} We find the trial court's findings under (E)(1) and (E)(4) were supported by clear and convincing evidence. The record establishes that Mother

failed continuously and repeatedly to substantially remedy any of the conditions that caused the Children to be placed in foster care. Although Mother's case plan required random drug screens, mental-health improvement, housing, employment, and domestic-violence counseling, the evidence demonstrated that Mother had not participated in the drug screens, did nothing to improve her mental health, did not demonstrate that she had secured stable housing, did not have consistent employment, and did not partake of domestic-violence services.

{¶ 41} The court's finding that Mother lacked commitment to the Children pursuant to (E)(4) is also supported by clear and convincing evidence. The testimony at trial established that Mother failed to follow her case plan or attend visitations regularly. Visits were decreased from weekly to biweekly because of Mother's spotty attendance. Even then, Mother missed several visits with the Children. For three months, from March to May, Mother did not visit her Children. Further, the evidence revealed "other actions showing an unwillingness to provide an adequate permanent home" under (E)(4). For example, Mother's erratic and aggressive behavior during two separate visits with her Children resulted in security being called.

{¶ 42} The evidence clearly and convincingly shows that Mother failed to remedy the conditions that caused the Children to be placed in foster care and demonstrated a lack of commitment toward the Children such that the Children "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent."

## IV. Conclusion

{¶ 43} Upon review, we find the juvenile court's decision awarding permanent custody to CCDCFS and terminating Mother's parental rights was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, Mother's sole assignment of error is overruled.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR