[Cite as *In re A.E.*, 2025-Ohio-1467.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE A.E., ET AL.                          :

Minor Children                              :

                                               No. 114614
[Appeal by Father]                          :

                                            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 24, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22908791, AD22908792, and AD22908796

---

### *Appearances:*

Marc L. Stolarsky Law, LLC, and Marc L. Stolarsky, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* Cuyahoga County Division of Children and Family Services.

ANITA LASTER MAYS, J.:

{¶1} In this appeal, defendant-appellant, Father of Am.E., Ar.E., and D.B. ("the children"), appeals the trial court's decision granting permanent custody of

the children to the Cuyahoga County Division of Children and Family Services ("CCDCFS").[1]  We affirm the trial court's decision.

## I.    Procedural History

{¶2} On March 15, 2022, CCDCFS filed a complaint alleging that the children were abused, neglected, and dependent and requested a dispositional order of temporary custody, which was granted on September 1, 2022. On July 6, 2023, CCDCFS filed a motion to modify temporary custody to legal custody but amended the motion later as a request for permanent custody of the children.

{¶3} On September 18, 2024, Father filed a motion for legal custody and asked that the children be placed in his care for permanent custody.  On September 20, 2024, a trial was held, and at the conclusion, the trial court instructed counsel for CCDCFS and Father to file proposed findings of fact, conclusions of law, and written closing arguments.  On October 31, 2024, the trial court journalized entries for each child, where it terminated all parental rights and ordered the children placed in the permanent custody of CCDCFS.  On November 27, 2024, Father filed his notice of appeal, appealing the trial court's decision.

---

[1] A separate appeal was filed by S.E., who is the mother of a total of six children.  We only address Father's appeal herein regarding three of the children.

## II. Facts

{¶4} At trial, Sarah Smith ("Smith"), a child protection specialist with CCDCFS testified that Father had established paternity for the children. Tr. 67. Smith further testified that Father had "very sporadic interactions" with his children because he was coming back and forth from Las Vegas. Tr. 103. In 2023, Father gave Smith a local home address; however, it turned out to be an address to a post office. *Id.* Multiple times Smith explained to Father that he had to obtain a local residence in order to get custody of the children. However, Father refused to provide an address, telling Smith that "he was too famous to be investigated," that Smith was "trying to be too invasive in privacy," and that Smith "was trying to do a shakedown on him." Tr. 104.

{¶5} Additionally, Father claimed that he owned a warehouse that was being converted into a mansion and that he had multiple residences in buildings being constructed. However, none of his claims could be verified. In 2024, Father provided CCDCFS with another address. Smith was instructed by her supervisor to conduct an unannounced visit. Tr. 105. Upon Smith's arrival, Father's former fiancée, who identified herself as the housekeeper, answered the door; the fiancée resided at the address. However, Father did not reside there, but he provided an invalid lease agreement for that address. *Id.* Also, this residence was ruled out as a suitable living situation because the fiancée had a previous incident involving a firearm and the fatality of a child.

{¶6} Smith later determined that the owners of the home were Father's parents, who CCDCFS was unable to contact despite reaching out numerous times. Smith also testified regarding concerns about Father's ability to provide basic needs for the children. Smith stated that Father said, "he was famous, and he had private jets." Tr. 108. However, Father never provided any documentation of how he was going to provide for the children.

{¶7} Father was also inconsistent with visitation with the children. Smith testified that the only contact she was aware of was when Father came to see one of the children for their birthday. Smith claimed that she facilitated online video calls, but Father would not consistently log into the calls. Tr. 109. Father would state that Smith never got in contact with him or that he was unaware of a communication; however, Smith was able to document that emails were sent to Father for every communication. Tr. 110.

{¶8} When Father would participate in video calls with the children, he would tell the children that he had ponies and horses for them and had bank accounts with lots of money for them. Father claimed that the children would be famous singers with him, and as soon as he was granted custody, he was taking the children on a private jet to travel the world. *Id.* Father also told the children that CCDCFS was keeping them from him and trying to take the children away. Tr. 111. Smith testified that the children were very upset and it was a hard time for them because they thought he was going to provide an "extravagant life" for them. *Id.*

**{¶9}** Smith testified that a bond has not been created between Father and the children. The children asked Smith if she had been able to verify any of Father's claims. Smith told them that she was unable to verify. After that admission, the children, ages 14, 12, and 10, refused to engage with Father. Tr. 112. Smith suggested that Father write letters to the children, but he did not.

**{¶10}** Smith testified that Father has never provided any documentation that he is able to provide for the children or has a stable living space. Smith further testified that even with that documentation, she does not think Father could adequately provide for the children. Two of the children have significant medical needs, with one having liver disease and is in remission for leukemia. Another child has stage 4 kidney disease that is being addressed and monitored. Tr. 114. Smith testified that it is not in the children's best interest to be returned to either parent. Tr. 115.

**{¶11}** Father testified that he was living at the home Smith visited. He also testified that he felt CCDCFS was "gaslighting and manipulating him" and "kept moving the goalpost" with things they required of him. Tr. 232-233. As a result, Father testified that he became "reluctant" and "resistant" to give CCDCFS anything. *Id.* Father further testified that he reported his reluctance to his previous attorney who told him to send the required documentation to him. However, according to Father, the attorney became ill.

**{¶12}** The trial court interrupted the testimony and questioned Father:

THE COURT: I'm going to stop you really quick. Did you send the documentation to your previous counsel?

FATHER: Yes, your honor.

THE COURT: And did you send that via email or regular mail or hard copies?

FATHER: To the previous counsel we met at his facility, a meeting.

THE COURT: But you gave him hard copies of it?

FATHER: No, I didn't give him hard copies of it, your Honor.

THE COURT: So if I made a Court order to the previous counsel that said you have seven days to provide the information that [you] gave, what would you give him?

FATHER: What would my previous counsel give me?

THE COURT: Correct.

FATHER: I'm not sure.

THE COURT: Well, what did you give him?

FATHER: Well, when I came to these meeting — I want to be respectful of Mr. [Counsel].

THE COURT: Well, like here. Did you give him a W-2?

FATHER: No, your Honor.

THE COURT: Okay. So the documents that were talked about before, if I said to your previous counsel you have seven days to come to Court and give me those documents, the documents like a pay stub, tax returns, those wouldn't be there, right?

FATHER: Yes, your Honor. Yes, your Honor.

THE COURT: Okay.

Tr. 235-236.

{¶13} Father further testified that he was a musician and helped his father with managing property. When questioned about how much he made, he responded that he did not know. However, Father then stated that he made about $12,000 a year and gave CCDCFS a 1099 proving that fact. Father also testified that he makes $0 from being a musician. CCDCFS disputed that Father provided a 1099.

{¶14} Under cross-examination Father testified to the following:

COUNSEL: Okay. And in the past several month — actually I believe it was March 28th the Court instructed and you did file an affidavit in order to secure appointed counsel, correct?

FATHER: Correct.

COUNSEL: Okay. On that form you listed expenses in a monthly amount of over $2000, yet your income is listed as only $1000 per month. How do you make things work with that?

FATHER: That would shift when I'm back in the environment that feeds my primary focus, which is —

COUNSEL: Okay. But for right now clearly your expenses are over twice that you claim to earn in a month.

FATHER: Correct.

| | |
|---|---|
| COUNSEL: | How are you surviving right now? How are you paying those bills that you listed, the $850 child support, the $425 rent, the food of $305 a month, the telephone of $107, that transportation and fuel of $275 and the utilities of $200? How do you physically pay those bills with only $1000 a month? |
| FATHER: | Well that's a good question. Well, right not as I've been in Cleveland, again I had a team of assistants. |
| COUNSEL: | You said that before on direct. What does that mean you have a team of assistants? |
| FATHER: | Well, just women that are in my life would love so if they could cover some food or, you know, things, shift some things around, we work on it as a team. |
| COUNSEL: | So you've got assistants in covering those expenses? |
| FATHER: | Correct. |

Tr. 257-258.

{¶15} At the end of the trial, the trial court requested the parties to submit written closing with findings of fact and conclusions of law no later than October 11th, so 21 days from now. Tr. 261. On October 31, 2024, the trial court issued journal entries on the children, granting permanent custody to CCDCFS.

{¶16} Father filed this appeal, assigning one error for our review:

The trial court's decision to deny legal custody of the children to Father and award permanent custody to CCDCFS was against the standard of clear and convincing evidence established in R.C. 2151.414(E) and *In re Baby Girl Doe*, 2002-Ohio-4470 (6th Dist.).

## III. Permanent Custody

{¶17} Father argues that the reasons the trial court listed in the journal entries for awarding permanent custody to CCDCFS, under R.C. 2151.414(E), do not apply to him. To terminate parental rights and grant permanent custody to a county agency, the record must demonstrate by clear and convincing evidence the following: (1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) permanent custody is in the best interest of the child. *In re S.H.*, 2012-Ohio-4064, ¶ 27 (8th Dist.). "Clear and convincing evidence" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established. *In re Y.V.*, 2011-Ohio-2409, ¶ 13 (8th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶18} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and, (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.

{¶19} The Supreme Court of Ohio has stated that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody

determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio4703, ¶ 11.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, 972 N.E.2d 517.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

{¶20} Regarding the first prong of the analysis, for all the children, the trial court found by clear and convincing evidence that pursuant to R.C. 2151.414(B)(1)(a), "the child's continued residence in or return to the home of [Mother] or [Father] would be contrary to the child's best interest." Journal entries Nos. AD22908791, AD22908792, and AD22908796 (Oct. 31, 2024).

{¶21} Although Father is not contending that the trial court erred under R.C. 2151.414(D)(1), the trial court did analyze the factors and determined which

factors applied. *Id.* Father, however, argues that the findings the trial court made under R.C. 2151.414(E) were in error.

**{¶22}** The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist.). "'An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.'" *In re I.E.*, 2024-Ohio-5487, ¶ 23 (8th Dist.), quoting *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.).

**{¶23}** "Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied. Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest." *In re J.B.*, 2013-Ohio-1705, ¶ 80-81 (8th Dist.).

**{¶24}** The trial court determined that children could not be placed within a reasonable time or should not be placed with either parent because there is evidence that one or more factors in division (E) of R.C. 2151.414 exist:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services

and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(10) The parent has abandoned the child;

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

The Court does find by clear and convincing evidence that it is in the best interest of the child to be placed in the Permanent Custody of Cuyahoga County Division of Children and Family Services. The Motion to Modify Temporary Custody to Permanent Custody is hereby granted.

Journal entries Nos. AD22908791, AD22908792, and AD22908796 (Oct. 31, 2024).

**{¶25}** Father argues that the factors the trial court listed do not apply to him. The trial court's journal entries listed factors that applied to either Mother or Father. From the testimony and evidence presented at trial, R.C. 2151.414(E)(1), (4), and (14) apply to Father's situation. Father's own testimony demonstrates that

he is unable to provide financially for three children, because he earns $1,000 a month, but has over $2,000 in monthly finances. When questioned about how he makes up for the difference, he stated: "Well, just women that are in my life would love so if they could cover some food or, you know, things, shift some things around, we work on it as a team." Tr. 236.

{¶26} Father was also unable to demonstrate that he can provide adequate housing for his children. Father gave numerous addresses to buildings, a post office, and then an address where he could not verify that he either rents or owns. Father also was inconsistent with his visitation and video calls with the children. Father further argues that the alleged errors in his case are addressed in *In re Baby Girl Doe*, 2002-Ohio-4470 (6th Dist.). Father's assertions are not well taken. The Sixth District affirmed the trial court's decision to award permanent custody of the child to children's services. *Id.* at ¶ 1. In Father's brief, he quotes one of the assignments of error as the holding. Father incorrectly cites the court's holding in that case. The court did not hold that all parents have a constitutional right to direct the care, custody, and control of their children and such right is violated when a father's parental rights are terminated because he showed a commitment to his daughter, as Father stated in his brief.

{¶27} Instead the court stated:

Generally, parents have a paramount right to custody of their minor children. *In re Murray* (1990), 52 Ohio St.3d 155, 157. However, this right is not absolute. R.C. 2151.353 provides that if a child is

adjudicated an abused child, the court may commit the child to the permanent custody of a public children's service agency if the court determines (1) in accordance with R.C. 2151.414(E), that the child cannot be placed with one of his parents within a reasonable time or should not be placed with either parent and determines (2) in accordance with R.C. 2151.414(D), that permanent commitment is in the best interest of the child.

*Id.* at ¶ 88.

**{¶28}** Father again incorrectly states that the Sixth District held that a state agency fails to take reasonable efforts to reunify a child with her family when it ignores the efforts and wishes of a father and his family who never abused or neglected the child. Again, this was an error assigned by the appellant. The Sixth District overruled the appellant's argument.

**{¶29}** Additionally, the trial court stated that "the Guardian ad Litem recommends that Permanent Custody is in the child's best interest." Journal entries Nos. AD22908791, AD22908792, and AD22908796 (Oct. 31, 2024). Further, the court found by clear and convincing evidence that it is in the best interest of the children to be placed in the permanent custody of CCDCFS pursuant to R.C. 2151.414(D)(1) and (2) and granted CCDCFS's motion to modify temporary custody to permanent custody. The trial court terminated the rights of the parents.

**{¶30}** Thus, after a thorough review of the record, we find that the trial court did not err when it determined there is clear and convincing evidence supporting the determination to award permanent custody to CCDCFS and not legal custody to Father. Furthermore, upon our review, we find that the trial court's judgment

in each child's case is supported by sufficient evidence in the record and is not against the manifest weight of the evidence.

**{¶31}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MICHAEL JOHN RYAN, P.J., and
SEAN C. GALLAGHER, J., CONCUR